IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS SZCZUREK, | ) | CASE NO.  1:18-CV-02608-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| vs. | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM OPINION &** |
| Defendant. | ) | **ORDER** |

Plaintiff, Thomas Szczurek ("Plaintiff" or "Szczurek"), challenges the final decision of Defendant,

Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his application for a Period of

Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42

U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. §

405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below,

the Commissioner's final decision is AFFIRMED.

## I.      PROCEDURAL HISTORY

In January 2016, Szczurek filed an application for POD and DIB, alleging a disability onset date of

March 4, 2014, and claiming he was disabled due to degenerative joint disease.  (Transcript ("Tr.") at

185.)  The applications were denied initially and upon reconsideration, and Szczurek requested a hearing

before an administrative law judge ("ALJ").  (*Id.* at 15.)

On October 18, 2017, an ALJ held a hearing, during which Szczurek, represented by counsel, and

an impartial vocational expert ("VE") testified.  (*Id.*)  On May 18, 2018, the ALJ issued a written decision

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

finding Szczurek was not disabled. (*Id.* at 15-23.) The ALJ' s decision became final on October 1, 2018, when the Appeals Council declined further review. (*Id.* at 1-6.)

On November 13, 2018, Szczurek filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 11, 14.) Szczurek asserts a single assignment of error:

> (1) At [S]tep [F]our of the sequential evaluation process, the ALJ found that Mr. Szczurek was capable of performing his past relevant work as a company president. This finding is unsupported by substantial evidence when the ALJ failed to take into account the side effects Mr. Szczurek experiences from use of his pain medication, Norco.

(Doc. No. 11.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Szczurek was born in August 1957 and was 60 years-old at the time of his administrative hearing (Tr. 156), making him a "person of advanced age" under Social Security regulations. *See* 20 C.F.R. § 404.1563(e). He has a master's degree and is able to communicate in English. (Tr. 35.) He has past relevant work as a company president. (*Id.* at 22.)

### B.    Relevant Medical Evidence[2]

In 2008, Szczurek fell off a roof and fractured both his calcaneal[3] bones. (Tr. 365). On November 10, 2008, Szczurek underwent an open reduction and internal fixation of the calcaneus fracture on his right foot. (*Id.* at 241.) On November 17, 2008, the same procedure was done on his left foot. (*Id.* at 244.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3] "Pertaining to the calcaneus." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 270 (30th Ed. 2003). The calcaneus is "the irregular quadrangular bone at the back of the tarsus . . . ." *Id.*

On February 5, 2010, Szczurek's surgeon, Dr. James Sferra, M.D., removed painful hardware from the calcaneus bone in his left foot and performed a left calcaneal exostectomy, a left cuboid exostectomy, a left peroneous brevis and longus tenosynovectomy, and peroneous longus repair at that time. (*Id.* at 247.)

On April 16, 2012, Szczurek began seeing David Demangone, M.D., for pain management. (*Id.* at 364.) Szczurek complained of bilateral foot and ankle pain. (*Id.* at 366.) Dr. Demangone diagnosed Szczurek with osteoarthritis of the ankles and myofascial pain. (*Id.* at 364.) He prescribed Norco for the pain. (*Id.*) Szczurek attended follow-up visits with Dr. Demangone in May through August 2012. (*Id.* at 360-63.) At each visit, Dr. Demangone noted Szczurek was satisfied with his pain medication at the present time and had no medication side effects. (*Id.*) The pain medication enabled him to be productive. (*Id.*)

On August 23, 2012, Szczurek underwent a subtalar fusion and calcaneocuboid fusion on his left foot. (*Id.* at 249.)

On January 28, 2013, Szczurek returned to Dr. Demangone for pain management. (*Id.* at 359.) Dr. Demangone again prescribed Norco. (*Id.*) Szczurek saw Dr. Demangone for follow-up visits throughout 2013. (*Id.* at 350-59.) At each visit, Dr. Demangone noted Szczurek was satisfied with his pain medication at the present time and had no medication side effects. (*Id.*) Norco continued to enable him to be productive. (*Id.*)

On November 8, 2013, Szczurek saw Dr. Sferra for a follow-up visit. (*Id.* at 251.) Szczurek reported severe pain in his left foot/ankle when straightening his foot fully, bending his foot fully, walking on flat surfaces, going up and down stairs, and standing upright. (*Id.*) He also experienced severe stiffness in his left ankle/foot after sitting, lying, or resting later in the day. (*Id.*) Regarding his right foot/ankle, Szczurek reported moderate pain when twisting/pivoting, straightening his foot fully, bending his foot fully, walking on flat surfaces, and when standing upright. (*Id.* at 252.) He also experienced

moderate stiffness after sitting, lying, or resting later in the day. (*Id.*) Szczurek rated his pain at a 6/10 and he experienced pain with daily activities, exercising, and walking. (*Id.*)

On January 20, 2014, Dr. Sferra offered an opinion regarding Szczurek's impairments. (*Id.* at 253-54.) Dr. Sferra opined that Szczurek could:

- Stand/walk occasionally;
- Sit continuously throughout a workday;
- Lift 10 pounds occasionally and 20 pounds frequently.

(*Id.* at 253.) Dr. Sferra listed Szczurek's current restrictions as "limited walking, standing." (*Id.* at 254.) Improvement was not expected. (*Id.*) Dr. Sferra opined that Szczurek was unable to return to work due to his inability to stand and walk. (*Id.* at 253.)

On March 6, 2014, Szczurek returned to Dr. Demangone for pain management. (*Id.* at 349.) Dr. Demangone again prescribed Norco. (*Id.*) Szczurek saw Dr. Demangone for regular follow-up visits throughout the rest of 2014. (*Id.* at 343-49.) At each visit, Dr. Demangone noted Szczurek was satisfied with his pain medication at the present time and had no medication side effects. (*Id.*) Norco continued to enable him to be productive, more active, and complete his activities of daily living. (*Id.*)

On April 15, 2014, Szczurek saw Denise Stern, M.D., for follow-up regarding his high cholesterol. (*Id.* at 280.) Dr. Stern noted Szczurek had osteoarthritis in his left foot, but Celebrex helped. (*Id.*) A physical examination revealed Szczurek was in no acute distress, had a normal gait, normal movement of all extremities, and no joint swelling. (*Id.* at 282.)

On July 8, 2014, Szczurek saw Dr. Stern for another follow up appointment for his high cholesterol, foot pain, and elevated LFTs. (*Id.* at 276.) Szczurek denied any dizziness. (*Id.*) A physical examination revealed Szczurek was in no acute distress, had a normal gait, normal movement of all extremities, and no joint swelling. (*Id.* at 278-79.) Dr. Stern noted Szczurek had "[p]ersistent

degenerative changes left greater than right ankle/foot with history of calcaneal fracture." (*Id.* at 279.) Dr. Stern told Szczurek to continue the Celebrex once a day when necessary. (*Id.*)

On October 24, 2014, Szczurek again saw Dr. Stern. (*Id.* at 272.) Szczurek again denied any dizziness. (*Id.*) A physical examination revealed Szczurek was in no acute distress, had a normal gait, and had no joint swelling. (*Id.* at 274-75.) Dr. Stern noted Szczurek had "degenerative changes left foot a history of remote trauma," and he was to continue to take Celebrex when necessary. (*Id.* at 275.)

Throughout 2015, Szczurek continued to see Dr. Demangone for pain management. (*Id.* at 330-42.) At each visit, Dr. Demangone noted Szczurek was satisfied with his pain medication at the present time and had no medication side effects. (*Id.*) Norco continued to enable him to be more mobile, walk, and work. (*Id.*)

In January and February 2016, Szczurek saw Dr. Demangone for pain management. (*Id.* at 328-29.) At both visits, Szczurek told Dr. Demangone he was satisfied with his pain medication at the present time and denied any medication side effects. (*Id.*) Norco enabled him to do his activities of daily living. (*Id.*)

On March 11, 2016, Szczurek saw Dr. Demangone with complaints of increased pain in his left foot. (*Id.* at 327.) But Szczurek remained satisfied with his pain medication at the present time and denied any medication side effects. (*Id.*) Dr. Demangone prescribed Norco and a Medrol dose pack. (*Id.*)

On March 18, 2016, Szczurek sent a fax to the claims representative at the Social Security Administration. (*Id.* at 233.) He wrote, "In my work history report I sent to you in February, I said that I quit working permanently 3/4/14 due to the increasing pain and my inability to focus on work related activities. Space was limited in the remarks section but I wanted to tell you more about this." (*Id.*) Szczurek reported that Norco, which he had been taking four times a day for years, made him "zoned out"

and "unable to think clearly and straight while having to deal with dizzy spells." (*Id.*) Szczurek attached an information sheet regarding adverse reactions to Norco. (*Id.* at 234-35.)

On April 11, 2016, Szczurek attended a follow-up appointment with Dr. Demangone for pain management. (*Id.* at 407.) He told Dr. Demangone he was satisfied with his pain medication at the present time and had no medication side effects. (*Id.*)

On May 9, 2016, Szczurek attended a follow-up appointment with Dr. Demangone for pain management. (*Id.* at 406.) He again told Dr. Demangone he was satisfied with his pain medication at the present time and had no medication side effects. (*Id.*)

On May 27, 2016, Szczurek saw orthopedic specialist John C. Feighan, M.D., for complaints of bilateral foot pain with walking, with worse pain in the left foot. (*Id.* at 416.) Szczurek reported most of his pain was over the left lateral hindfoot. (*Id.*) He denied any locking or catching. (*Id.*) He also experienced some tolerable achiness in his right foot. (*Id.*) He was not working at that time. (*Id.*) A physical examination revealed no subtalar motion on the left foot but good subtalar motion on the right. (*Id.* at 418.) Szczurek had mild tenderness at the CC joint and tenderness over the peroneal tendons distally. (*Id.*) He performed straight leg raises bilaterally, had 5/5 strength in all four planes, and his sensation to light touch was intact. (*Id.*) Dr. Feighan reviewed x-rays of both feet taken that day and noted osteopenic bones and post-surgical changes, but also noted fairly well-maintained joint spaces bilaterally, stable hardware and no stress fracture on the left, and mild degenerative change at the CC joint on the right. (*Id.* at 419-20.) Dr. Feighan gave Szczurek a lidocaine and dexamethasone injection in his left peroneal sheath. (*Id.* at 420.)

On June 6, 2016, Szczurek saw Dr. Demangone for a pain management follow-up appointment. (*Id.* at 405.) He again told Dr. Demangone he was satisfied with his pain medication at the present time and had no medication side effects. (*Id.*)

On June 24, 2016, Szczurek went to a follow-up visit with Dr. Feighan. (*Id.* at 427.) The injection he received in May provided short-term relief. (*Id.*) He had more pain along his left lateral hindfoot. (*Id.*) Szczurek felt his symptoms were bad enough for him to consider additional surgery. (*Id.* at 429.) Dr. Feighan discussed peroneal tendon exploration and hardware removal with Szczurek. (*Id.*)

On June 27, 2016, Szczurek attended a follow-up appointment with Dr. Demangone for pain management. (*Id.* at 404.) He again told Dr. Demangone he was satisfied with his pain medication at the present time and had no medication side effects. (*Id.*)

On July 19, 2016, Szczurek saw Dr. Demangone for another follow-up appointment. (*Id.* at 403.) The treatment notes show Szczurek came back twice in 21 days even though he had a 28-day supply of pain medication. (*Id.*) Szczurek continued to report he was satisfied with his pain medication at the present time and had no side effects. (*Id.*) Szczurek echoed those statements at his August 30, 2016 follow-up appointment with Dr. Demangone. (*Id.* at 402.)

On September 27, 2016, Szczurek saw Dr. Demangone and reported that Norco was not helping as much as it used to; he was supplementing Norco with Aleve as needed. (*Id.* at 492.) Szczurek stated maybe his feet were getting worse. (*Id.*) Szczurek continued to deny any medication side effects. (*Id.*)

On October 25, 2016, Szczurek attended a follow-up appointment with Dr. Demangone and told him the pain had not been as "flared up" the past month. (*Id.* at 493.) Szczurek stated he was satisfied with his pain medication and denied any medication side effects. (*Id.*) Norco helped him function. (*Id.*) Szczurek repeated his satisfaction with his medication and his denial of any side effects when he saw Dr. Demangone in November and December 2016. (*Id.* at 494-95, 503-04.)

On November 17, 2016, Szczurek followed up with Dr. Feighan to discuss left foot surgery. (*Id.* at 432.) A physical examination revealed no changes. (*Id.* at 434.) Szczurek remained tender over the lateral hindfoot hardware and over the course of the distal peroneal tendons. (*Id.*) Dr. Feighan diagnosed

Szczurek with peroneal tendinitis of the left lower extremity and osteoarthritis of the left foot. (*Id.*)  Dr. Feighan and Szczurek discussed hardware removal and exploration of peroneal tendons on his left foot. (*Id.*)

On January 17, 2017, Szczurek attended a follow-up appointment with Dr. Demangone for pain management.  (*Id.* at 505-06.)  He again told Dr. Demangone he was satisfied with his pain medication at the present time and had no medication side effects.  (*Id.* at 505.)

On January 19, 2017, Dr. Feighan surgically removed hardware from Szczurek's left hindfoot and repaired the peroneal longus split tear in his left foot.  (*Id.* at 443.)

On February 21, 2017, Szczurek attended a follow-up appointment with Dr. Demangone for pain management.  (*Id.* at 507-08.)  Dr. Demangone noted Szczurek "underwent surgery to his left foot recently and Dr. Fein [sic] prescribed some oxycodone." (*Id.* at 507.)  Szczurek again told Dr. Demangone he was satisfied with his pain medication at the present time and had no medication side effects.  (*Id.*)

On February 23, 2017, Szczurek saw Dr. Feighan for a post-surgery follow-up appointment.  (*Id.* at 451.)  Szczurek had been walking in shoes for the past two weeks, although he still had "some sensitivity deep around the scar." (*Id.*)  Physical examination revealed a well-healed incision, minimal swelling, and no pain with resisted plantarflexion.  (*Id.* at 453.)  Dr. Feighan recommended Szczurek "progress activity as tolerated" with no restrictions.  (*Id.*)  Szczurek was to wear supportive shoes and follow up as needed. (*Id.*)

Szczurek attended follow-up visits with Dr. Demangone for pain management in March, April, May, and June 2017.  (*Id.* at 509-22.)  At his March 21, 2017 appointment, Szczurek reported he was "still having left foot pain" after his January 2017 surgery, and that the surgery "hadn't helped to relieve the pain." (*Id.* at 509.)  Dr. Demangone noted Szczurek was going to physical therapy.  (*Id.*)  At his April appointment, Szczurek told Dr. Demangone he had "no new pain issues." (*Id.* at 517.)  At each of these

visits, Szczurek denied medication side effects and Dr. Demangone continued Norco. (*Id.* at 509-22.) Dr. Demangone also provided Szczurek with educational information regarding chronic pain and exercise. (*Id.* at 517-18.)

On June 29, 2017, Szczurek saw Dr. Feighan complaining of some lateral foot pain and some burning pain since Memorial Day. (*Id.* at 456.) Dr. Feighan noted Szczurek was awaiting new orthotics. (*Id.*) A physical examination revealed tingling around the lateral foot. (*Id.* at 458.) Dr. Feighan reviewed x-rays taken the same day of both feet. (*Id.* at 459.) Dr. Feighan "did not see anything surgical here." (*Id.* at 460.) He recommended custom orthotics and that Szczurek consider pain management. (*Id.*)

Szczurek saw Dr. Demangone for pain management in July and August 2017. (*Id.* at 523-26.) He again told Dr. Demangone he was satisfied with his pain medication at the present time and had no medication side effects. (*Id.*) Dr. Demagone continued Norco (*id.*) and provided Szczurek with educational information on foods good for arthritis. (*Id.* at 523.) The treatment notes from Szczurek's August visit reflect Szczurek reported he was applying for disability and would need paperwork filled out and a functional capacity exam done. (*Id.* at 525.)

On August 2, 2017, Szczurek saw Partick McKee, DPM, for bilateral foot pain, worse in the left foot, that had been worsening. (*Id.* at 537.) Walking and standing aggravated his pain, while topical medication Voltarin and Norco alleviated it. (*Id.*) While his pain was constant, it was worse with standing followed by walking. (*Id.*) Szczurek also complained of muscle weakness. (*Id.* at 538.) A physical examination revealed +5/5 muscle strength with dorsiflexion, plantarflexion, inversion, and eversion bilaterally. (*Id.* at 540.) Szczurek retained a full range of motion at the ankle joints bilaterally. (*Id.*) Dr. McKee believed this "points to 4th-5th MT base cuboid" and assessed "sural neuritis vs 5th MT base-cuboid arthritis left." (*Id.*) Dr. McKee discussed with Szczurek "the possibility of sural nerve, diagnostic block option, EMG, surgery with plastics," and a consult with another doctor. (*Id.*)

On September 11, 2017, Szczurek attended a follow-up appointment with Dr. Demangone for pain management. (*Id.* at 527-28.) He again told Dr. Demangone he was satisfied with his pain medication at the present time and had no medication side effects. (*Id.* at 527.)

## C.     State Agency Reports

On April 8, 2016, Gail Mutchler, M.D., opined that Szczurek had the ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for a total of four hours, and sit for a total of about six hours in an eight-hour workday. (*Id.* at 71-72.) She found Szczurek's ability to push and pull limited in both lower extremities and limited him to occasional use of foot controls bilaterally. (*Id.* at 71.) He could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch. (*Id.* at 71-72.) He could never climb ladders, ropes, or scaffolds. (*Id.* at 71.) His ability to crawl was unlimited. (*Id.* at 72.) All standing positions were reduced to at least occasional in conjunction with the standing and walking restrictions. (*Id.*) On July 11, 2016, Teresita Cruz, M.D., affirmed Dr. Mutchler's opinions on reconsideration. (*Id.* at 82-84.)

## D.     Hearing Testimony

During the October 18, 2017 hearing, Szczurek testified to the following:

- He lives with his wife and an adult son. (*Id.* at 52.)

- The pain he experiences in both feet stems from a traumatic fall in 2008. (*Id.* at 39-40.) His pain has continued to grow over the years. (*Id.* at 38.) He underwent one surgery on his right foot and four on his left. (*Id.* at 42.) His surgeon told him he would have "lifelong pain." (*Id.*) After each surgery, the pain returned within a matter of months. (*Id.* at 44.)

- He can sit for approximately 45 minutes before he needs to get up and walk. (*Id.*) He can only walk for about five minutes before the pain causes him to look for a place to sit. (*Id.*) He is most comfortable in his recliner with it pushed all the way back. (*Id.* at 45.) He spends about six to seven hours of his day in his recliner. (*Id.*)

- He takes Norco four times a day to manage his pain. (*Id.* at 46.) He has been taking Norco since the summer of 2012. (*Id.*) The Norco makes him a "shell" of himself. (*Id.*) The medication makes him "fade off here and there" and causes "cloudy

thinking" and drowsiness. (*Id.*) It also makes him a little dizzy and affects his ability to concentrate. (*Id.*) He has a hard time thinking straight the way he used to. (*Id.*) Norco, along with Celebrex, "soften" his pain; they allow him to function, *i.e.*, get around the house a bit. (*Id.* at 48.) Even with the Norco, he cannot do much walking and his functional capacity remains limited. (*Id.*)

- He is pretty much home-bound. (*Id.* at 47.) He goes to the grocery store and church but come November he will be shut up in the house. (*Id.*) He makes a few meals and pays the bills. (*Id.*) Things take longer for him to do now. (*Id.*)

- He does upper body exercises at home. (*Id.* at 49.)

The VE testified Szczurek had past work as a company president. (*Id.* at 53.) The ALJ then posed the following hypothetical question:

> At this time, sir, I'd ask you to assume a hypothetical individual with the past jobs that you just described. I'd further ask you to assume the hypothetical individual is limited to the following. The hypothetical individual would fall within the exertional category of sedentary with the following further restrictions. The hypothetical individual would be limited insofar as they would only occasionally be required to climb ramps and stairs, never use ladders, scaffolds, or ropes. Could occasionally balance, stoop, kneel, crouch, and crawl. The hypothetical individual would be limited insofar as they would be restricted from – strike that. The hypothetical individual would never be required to operate a motor vehicle during the course of a workday as part of the job duties. And that would be the extent of the restrictions for the first hypothetical. Sir, with those restrictions would a hypothetical individual be able to perform any of the past jobs as described earlier in your testimony?

(*Id.* at 55.)

The VE testified the hypothetical individual would be able to perform Szczurek's past work as company president as it is described in the DOT, but not as Szczurek performed it (light). (*Id.* at 56.)

The ALJ then posed the following hypothetical:

> For the next hypothetical, the hypothetical individual would have the same restrictions as in the first hypothetical, however, the hypothetical individual would be limited to – I think those goes [sic] with driving, but we'll say it anyways, occasional bilateral foot controls. With that further restriction would the hypothetical individual be able to perform the past work described earlier in your testimony?

(*Id.*)

After some clarification, the VE testified the hypothetical individual would be able to perform Szczurek's past work as company president.  (*Id.* at 58-59.)

The ALJ then posed the following hypothetical:

> For the next hypothetical the hypothetical individual would have the same restrictions as in the first hypothetical, however, the hypothetical individual would fall within the exertional category of light, however, the hypothetical individual would be reduced to standing and walking four hours out of an eight hour day, which is like light-light.  With that further restriction added to the – added to the restrictions of the second hypothetical of occasional bilateral foot controls, would a hypothetical individual be able to perform the past work described earlier in your testimony?

(*Id.* at 56-57.)

After some clarification, the VE testified the hypothetical individual could perform Szczurek's past work.  (*Id.* at 58-59.)

The ALJ asked the VE whether there would be any transferable skills for the individual in the second and third hypotheticals.  (*Id.* at 57.)  The VE testified there would not be any transferable skills from Szczurek's past employment to other jobs that could be performed.  (*Id.*)

The ALJ then posed the following to the VE:

> If you were to add to any of the earlier hypotheticals the following further restriction, and that would be that due to ongoing pain the hypothetical individual would find themselves to be distracted by it, but would be able to add the following further restriction added to any of the hypotheticals, and that would be that the hypothetical individual would be limited to simple, routine, and repetitive work, with that restriction added to any of the earlier hypotheticals, would a hypothetical individual be able to perform any of the past job described in your earlier testimony?

(*Id.* at 59-60.)

The VE testified that simple, routine, repetitive work is more consistent with unskilled work, and Szczurek is highly skilled.  (*Id.* at 60.)

Szczurek's attorney asked the VE how adding a restriction of an individual who would be off task 20% of the work day due to pain and side effects from medication would affect his answers to the above hypotheticals. (*Id.*) The VE testified that 20% off task exceeded competitive tolerances. (*Id.*)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.

*See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Szczurek was insured on his alleged disability onset date, March 4, 2014, and remained insured through December 31, 2017, his date last insured ("DLI.") (Tr. 15.) Therefore, in order to be entitled to POD and DIB, Szczurek must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2017.

2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of March 4, 2014 through his date last insured of December 31, 2017 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: a history of calcaneal fractures; osteoarthritis; and status post hind foot hardware removal following failed fusion.  (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, including listing 1.02, 1.03, and 1.06.  (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that he can occasionally climb ramps or stairs; he can never climb ladders, ropes, or scaffolds; he can occasionally balance, stoop, kneel, crouch, or crawl; he can

14

never operate a motor vehicle during the course of a workday as part of his job duties; and he can occasionally operate bilateral foot controls.

6.   Through the date last insured, the claimant was capable of performing past relevant work, as generally performed, as a company president (DOT# 189.117-026), SVP 8, classified at the sedentary level. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.   The claimant was not under a disability, as defined in the Social Security Act, at any time from March 4, 2014, the alleged onset date, through December 31, 2017, the date last insured (20 CFR 404.1520(f)).

(Tr. 17-22.)

## V.   STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800

F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

As the Commissioner points out (Doc. No. 14 at 7 n.3), although Szczurek frames his argument as a Step Four challenge (Doc. No. 11 at 8), the crux of his argument concerns the ALJ's RFC findings and subjective symptom analysis, both of which occur before Step Four. Szczurek maintains that in finding him capable of performing his past work as a company president, "the ALJ unreasonably failed to consider whether [he] retained the mental acuity to perform the tasks required of a company president." (Doc. No. 11 at 9.) Szczurek argues that the "ALJ's decision fails to address the adverse side effects" Szczurek experiences from his pain medication, Norco, and the ALJ fails to "identify any inconsistency in the record" regarding Szczurek's Norco use and the side effects he alleges he experiences. (*Id.* at 10.)

The Commissioner asserts substantial evidence supports the ALJ's RFC and subjective symptom analysis, emphasizing that Szczurek denied any pain medication side effects at over 30 visits with his medical providers from 2012 through 2015, and over 19 visits in 2016 through 2017. (Doc. No. 14 at 4-8.) In addition, from 2012 through 2017, Szczurek "consistently presented in no distress, expressed satisfaction with his medication regime [sic], and confirmed that his medication improved his quality of life." (*Id.* at 5.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 404.1527(d)(2).[4] An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 404.1527(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence, 20 C.F.R. § 404.1546(c), and must consider all of a claimant's medically determinable

---

[4] This regulation has been superseded for claims filed on or after March 27, 2017. As Szczurek's application was filed in January 2016, this Court applies the rules and regulations in effect at that time.

impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (*citing Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, it is well-established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms. *See, e.g., Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 542 (6th Cir. Aug. 5, 2014); *Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 821 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p, 2016 WL 1119029 (March 16, 2016).

If the claimant's allegations are not substantiated by the medical record, the ALJ must evaluate the individual's statements based on the entire case record. The evaluation of a claimant's subjective

complaints rests with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. Beyond medical evidence, there are seven factors that the ALJ should consider.[5] The ALJ need not analyze all seven factors but should show that he considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005). The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so.").

While "[t]he discretion afforded by the courts to the ALJ's evaluation of such evidence is extremely broad," *Schroer v. Comm'r of Soc. Sec.*, No. 1:17 CV 1620, 2018 WL 3145846, at *4 (N.D. Ohio June 12, 2018), *report and recommendation adopted by* 2018 WL 3135924 (N.D. Ohio June 27, 2018), "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (citing *Rogers*, 486 F.3d at 248-49), *report and recommendation adopted by*

---

[5] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029, at *7.

2019 WL 3752687 (N.D. Ohio Aug. 8, 2019). Harmless error analysis applies to an ALJ's subjective symptom evaluation. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012).

Here, the ALJ acknowledged Szczurek's complaints of increasing pain in both feet and discussed the medical and opinion evidence at length. (Tr. 19-22.) The ALJ found Szczurek's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (*Id.* at 19.) The ALJ continued:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, they are inconsistent because while the claimant certainly experienced pain and weakness as a result of his physical impairments, after his last surgery he largely presented with normal findings. The claimant largely seemed satisfied with his medication regimen and presented in no distress. The most recent treatment notes indicate that the claimant also suffered from arthritis in the left shoulder, which would further limit his postural activities. However, he presented with good strength, range of motion, and sensation. Treatment providers recommended conservative measures. These findings suggest that the claimant could perform less than the full range of sedentary work, with additional postural, foot control, and environmental limitations.

(*Id.*)

Based on the above and his review of the medical and opinion evidence, the ALJ formulated the following RFC:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that he can occasionally climb ramps or stairs; he can never climb ladders, ropes, or scaffolds; he can occasionally balance, stoop, kneel, crouch, or crawl; he can never operate a motor vehicle during the course of a workday as part of his job duties; and he can occasionally operate bilateral foot controls.

(*Id.* at 18.)

The Court finds substantial evidence supports the ALJ's RFC determination and subjective symptom evaluation. While the ALJ erred in omitting any discussion of Szczurek's letter to the Agency's claim representative regarding the side effects he claimed to experience from Norco (*id.* at 233) and his testimony at the hearing regarding the same (*id.* at 46-47), a review of the ALJ's decision as a whole and the entire record show this error was harmless.

During his discussion of the medical evidence, the ALJ noted multiple instances where Szczurek told his medical providers he was satisfied with his medication:

- "[In March 2015], the claimant attended a pain management appointment where he denied any new issues and stated that he was satisfied with treatment. He presented in no distress and reported that the Norco helped improve his ability to walk." (*Id.* at 20.)

- "At subsequent pain management visits from April to August 2016, he presented in no distress and reported that he was satisfied with his medications. (Ex. 7F.)" (*Id.*)

- "However, at visits in April and May 2017, the claimant presented in no distress and reported that he had no new pain issues and was satisfied with his medication. He was given educational materials on chronic pain and exercise, and his Norco was continued. (Ex. 10F.)" (*Id.* at 21.)

While the ALJ's decision did not mention explicitly Szczurek's denials of medication side effects, the ALJ's discussion "evidences a judgement" that the side effects were not as limiting as Szczurek alleged. *Acoff v. Comm'r of Soc. Sec.*, No. 1:18 CV 1444, 2019 WL 2359878, at *9 (N.D. Ohio April 22, 2019), *report and recommendation adopted by* 2019 WL 2358969 (N.D. Ohio June 4, 2019).

"Additionally, in reviewing for substantial evidence, the Court may review the entire record, not just the records cited by the ALJ." *Acoff*, 2019 WL 2359878, at *8 (citing *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004)). Here, additional records support the ALJ's RFC and subjective symptom evaluation. A review of the record reveals that Szczurek, over the course of several years, consistently denied any medication side effects at his pain management visits, in addition to denying any dizziness in visits with his internal medicine provider. (Tr. 272, 276, 327-63, 402-07, 492-95, 503-28.) Although in his brief, Szczurek claims to have "consistently reported adverse side effects" from Norco, he cites to no

record evidence in support of this statement and the Court's review of the record reveals the opposite. Therefore, the ALJ's error in failing to mention Szczurek's letter and testimony regarding medication side effects is harmless.

"No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (citation omitted). *See also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (citation omitted).

For all the foregoing reasons, the ALJ's decision must be affirmed.

## VI.     CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date:  November 1, 2019                         *s/ Jonathan Greenberg*
                                                             Jonathan D. Greenberg
                                                             United States Magistrate Judge